United States District Court
Southern District of Texas

**ENTERED**

June 19, 2020

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **STEVEN ANDREW BASS,** | OF SOCIAL SECURITY, |
| **Plaintiff,** | Defendant. |
| | § |
| **v.** | § |
| | § |
| **ANDREW SAUL**[1]**, COMMISSIONER** | §    CIVIL ACTION H-19-1525 § |
| | § § |
| | § |

---

[1]

On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration.

<u>MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY</u>
<u>JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY  JUDGMENT</u>

Before the Magistrate Judge[2]in this social security appeal is Plaintiff's Motion for

Summary Judgment (Document No. 9), Defendant's Response to Plaintiff's Motion for Summary

Judgment (Document No. 13), Defendant's Motion for Summary Judgment (Document No. 11),

and Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 14).

After considering the cross motions for summary judgment, the administrative record, and the

applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's

Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for

Summary Judgment (Document No. 9) is DENIED, and the decision of the Commissioner is

AFFIRMED.

## I.     Introduction

Plaintiff, Steven Andrew Bass ("Bass"), brings this action pursuant to Social Security Act

("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of


the Social Security Administration ("Commissioner") denying his application for

disability benefits ("DIB"). Bass argues that the Administrative Law Judge ("ALJ") committed

errors of law when he found that Bass was not disabled. Bass argues that the ALJ, Richard A.

Gilbert, erred in  giving "no weight" to two treating sources' opinions without evaluating those

opinions under the 20 C.F.R. § 404.1527(c) factors. Bass seeks an order reversing the

Commissioner's final administrative decision and denying the Commissioner's cross-motion for

summary judgment, and awarding benefits. The Commissioner responds that there is substantial

[2]The parties consented to proceed before the undersigned Magistrate Judge on August 27, 2019.
(Document No. 12).

evidence in the record to support the ALJ's decision that Bass was not disabled, and that the decision should, therefore, be affirmed.

## II.      Administrative Proceedings

On May 20, 2015, Bass filed for DIB claiming he has been disabled since August 27, 2013, due to the following impairments: back injury L4-L5, L5-S1; neck injury, arms go numb; widemouth left anterior lateral abdominal wall eventration; hernia; left leg swelling; massive nerve damage throughout left leg; muscle loss in left leg; sensation loss in pelvic, groin, and pubic area; depression; and very irritable. (Tr. 213-214, 248). The Social Security Administration denied his application at the initial and reconsideration stages. (Tr. 124, 130). Bass then requested a hearing before an ALJ. (Tr. 134-135). The Social Security Administration granted his request, and the ALJ held a hearing on November 15, 2017. (Tr. 34-64). On December 26, 2017, the ALJ issued his decision finding Bass not disabled. (Tr. 12-31).

Bass sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 203-207). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Bass's contentions in light of the applicable regulations and evidence, the Appeals Council, on February 26, 2019, concluded that there was no basis upon which to grant Bass's request for review. (Tr. 1-9). The ALJ's findings and decision thus became final.

Bass has timely filed his appeal of the ALJ's decision. The Commissioner has filed a Motion

for Summary Judgment. (Document No. 11). Likewise, Plaintiff has filed a Motion for Summary Judgment. (Document No. 9). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 1939. (Document No. 5). There is no dispute as to the facts contained therein.

### III.   Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (2018). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even  if the evidence preponderates against the Commissioner's decision.  *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*,  954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act,

to be "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

*v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less

than  a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must

create more than "a suspicion of the existence of the fact to be established, but no 'substantial

evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no

contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting

*Hemphill v.  Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42  U.S.C. § 423(d)(1)(A) (2018). The impairment must be proven through medically

accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be

so severe as to limit  the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is

suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, [he] will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents [him] from doing any other substantial gainful activity, taking into consideration  [his] age, education, past work experience, and residual functional capacity, [he] will be found disabled.

*Id.* at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914  F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.[3]

In the instant action, the ALJ determined, in his December 26, 2017, decision, that Bass

---

[3]Several of the Social Security Rulings ("SSRs") governing social security cases were amended or rescinded in 2016 and 2017. *See, e.g.,* 81 Fed. Reg. 66,138 (Sept. 26, 2016); 82 Fed. Reg. 5844 (Jan. 18, 2017). Depending on the regulation, the new rules apply to claims filed either on or after January 17, 2017, or March 27, 2017. The regulations provide, in pertinent part, that "[w]e expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). 81 Fed. Reg. at 66,138, n.1. Because Bass filed his application for DIB prior to January 17, 2017, the Court will cite to the old rules that are applicable to claims filed prior to 2017.

was not disabled at step five. In particular, the ALJ determined that Bass met the insured status

requirements for DIB through December 31, 2016,[4] and that Bass had not engaged in substantial

activity since August 27, 2013, the alleged onset date (step one); that Bass's hypertension, history

of Wolff-Parkinson-White syndrome status post ablation, chronic pain syndrome, history of back

surgery, lumbar spondylosis, history of hernia repair, depression, and anxiety were all severe

impairments (step two); that Bass did not have an impairment or combination of impairments

that meet or medically equaled one of the listed impairments in Appendix 1 of the regulations

(step three); that Bass had the RFC to perform sedentary work with the following limitations:

> The claimant can occasionally climb ramps and stairs but never climb ladders,
> ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.
> The claimant should have an alternate sit/stand option where the claimant has to
> stand every two hours and return to the seated position after five minutes of
> standing. The claimant should avoid rough and uneven surfaces. The claimant
> should do no work around unprotected heights, open flames, or dangerous and/or
> moving machinery. The claimant should avoid concentrated exposure to extreme
> heat, cold, humidity, and vibrations. The claimant can understand, remember, and
> carry out short and simple instructions, maintain attention and concentration for
> extended periods on simple tasks, and is limited to simple, routine, repetitive
> tasks. The claimant can have superficial interaction with the general public and
> occasional interaction with coworkers and supervisors. (Tr. 19).

The ALJ further found that Bass could not perform any past relevant work as a diver and

welder (step four); and that based on Bass's RFC, age (45), education (high school), work

experience, and the testimony of a vocational expert, that Bass could perform work as a

surveillance monitor, an optical goods worker, and a final assembler, and that Bass was

not disabled within the meaning of the Act (step five). As a result, the Court must

---

[4]The ALJ incorrectly determined that Bass was insured for DIB through December 31, 2016,
thereby requiring him to establish disability on or before December 31, 2016. (Tr. 17). However,
in its decision, the Appeals Council determined that the Certified Earnings Records showed that
he was insured for DIB through December 31, 2017, thereby requiring him to establish disability
on or before December 31, 2017. (Tr. 4).

determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated  by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.

*Wren*, 925 F.2d at 126.

## V.    Discussion

### A. Objective Medical Evidence

#### 1. Physical Impairments

The objective medical evidence shows that Bass has a history of Wolff-Parkinson White syndrome status post ablation[5], chronic pain syndrome, depression, hypertension, and back surgery. (Tr. 917, 1438). Bass has also been treated for a hernia, spondylosis, neural foraminal narrowing at the L4-L5 and L5-S1 discs, and canal stenosis at the L5-S1 disc (*See* Tr. 364, 372, 515-516, 522, 557-558, 951, 1037-1041, 1056, 1510). On April 27, 2012, a lumbar spine MRI revealed a 6 mm degenerative retrolisthesis, intervertebral disc height loss, spondylosis, and severe bilateral neural foraminal stenosis with compression at the L5-S1 disc; moderate left foraminal disc protrusion causing  moderately severe left neural foraminal encroachment, mild stenosis, and  borderline narrowing of the central canal at the L4-L5 disc; and no significant canal or foraminal stenosis at the L1-L2, L2-L3, and L3-L4 discs. (Tr. 1510). A right shoulder MRI from April 27, 2012, revealed a mild myotendinous strain of the trapezius, no rotator cuff or

---

[5]Bass had an ablation in 2007. (Tr. 917).

labral injury, and  mild acromioclavicular osteoarthritis mildly encroaching on the supraspinatus

outlet. (Tr. 1518).

On May 2, 2012, Bass was seen by Dr. Ali F. Azimpoor ("Azimpoor"), M.D.. (Tr. 1508).

In a letter to Dr. Trang Trinh ("Trinh"), M.D.,  Dr. Azimpoor explained  that Bass "complains of

chronic back pain," which goes back 15 to 20 years, and that "[u]pon neurologic examination,

[he] did not find any  weakness, reflex change, or sensory deficit," but noted  that Bass "[did]

have restriction of movement of his back in either direction." (Tr. 1508). The letter also restated

the findings from the April 27, 2012 MRIs. (Tr. 1508). An examination of the lumbar spine,

conducted on July 22, 2013, revealed degenerative changes without positional listhesis at the

L5-S1. (Tr. 366). On August 27, 2013, Bass underwent a spinal  surgery  at the L5-S1 level. (Tr.

364). Bass's discharge diagnoses were severe lumbar spondylosis at the level of L5-S1 and disk

herniation  essentially in the neural foramen at L4-L5. (Tr. 372). According to the discharge

summary, this accounted for Bass's persistent paresthesia in the left lower extremity. (Tr. 372).

On September 22, 2013, Bass was admitted to the emergency room at Memorial Hermann

Hospital in Katy, Texas. (Tr. 393).  A chest x-ray was taken, revealing no evidence of acute

cardiopulmonary process (Tr. 1106, 1111), and a lower extremity Doppler showed no deep

venous thrombosis of the lower extremities. (Tr. 1111). However, Bass did have chest

palpitations. (Tr.  1107). Bass was discharged on September 23, 2013 (Tr. 404), and  everything

looked fine upon discharge. (Tr. 393-396).

Throughout 2013, Bass was treated by Dr. Jeffery A. Astbury  ("Astbury"), M.D, for

hypertension and ongoing spinal pain. The March 4, 2013,  office visit revealed benign essential

hypertension and chronic low back pain. (Tr. 480). The April 4, 2013, visit revealed toe pain. (Tr.

477). The October, 19, 2013, visit revealed calf pain and lumbar radiculopathy. (Tr. 473). The

November 2, 2013, visit revealed benign essential hypertension, lumbar radiculopathy, and reflex sympathetic dystrophy. (Tr. 468).

On November 5, 2013, Bass was examined by Dr. Lorraine Rudder ("Rudder"), M.D. The examination results were unremarkable. (Tr. 509-513). She ordered a lumbar spine MRI without and with contrast and a thoracic spine MRI without and with contrast. On November 6, 2013, the lumbar spine MRI revealed the following: (1) no disc herniation, thecal sac stenosis, neural foraminal encroachment, facet hypertrophy, or ligamentum flavum thickening in the L1-L2, L2L3, and L3-L4 discs; (2) a 1.55 mm retrolisthesis and 2 mm left posterolateral protrusion with mild left neural foraminal narrowing at L4-L5; and (3) a significant degree of bone edema and enhancement within the L5 and S1 region surrounding the post-surgical level, infectious spondylitis, and a broad 2-3 mm disc protrusion with moderate bilateral neural foraminal narrowing. (Tr. 515-516). On November 27, 2013, the thoracic spine MRI revealed (1) mild thoracic dextroscoliosis; mild mid- and lower-thoracic spondylosis; and no thoracic disc herniation, thecal sac stenosis, nerve root impingement, or appreciated pathologic enhancement. (Tr. 522). When Bass visited Dr. Rudder on December 23, 2013, he complained of a new "stabbing burning sensation" in his back. (Tr. 525-526).

In visits on February, 27, 2014 (Tr. 537), May 21, 2014 (Tr. 542), June 19, 2014 (Tr. 546), July 17, 2014 (Tr. 550), September 11, 2014 (Tr. 555), and October 10, 2014 (Tr. 568), Dr. Rudder described Bass as having lumbar flexion to 75 degrees, having slight thrombotic thrombocytopenic purpura ("TTP") of the paraspinal m. bilateral, and being slow when changing from sitting to standing. A CT scan of Bass's abdomen/pelvis was conducted on September 26, 2014. (Tr. 557). The CT scan showed a hernia. (Tr. 557-558).

When Dr. Rudder examined Bass on June 25, 2015, she subjected him to several tests (algometry, inclinometry ("range of motion"), muscle strength training, grip strength

testing/validity, and a self-reporting questionnaire), from which she concluded that Bass has functional deficits: limited lumbar flexion range of motion ("ROM"); limited lumbar extension ROM; decreased left hip flexion muscle strength; decreased left hip extension muscle strength; decreased left knee extension muscle strength; decreased left foot dorsiflexion/inversion muscle strength; and decreased left foot eversion muscle strength, when compared bilaterally. (Tr. 590-592). Dr. Rudder also found that Bass had a 75% disability rating under the Functional Rating Index and that Bass self-reported having a 5/10 pain level. (Tr. 592).

Bass began visiting Dr. Jelani Ingram ("Ingram"), M.D., on November 12, 2014. (Tr. 586).  On February 9, 2015, Dr. Ingram described Bass as having pain in his muscles or joints, no limitation of range of motion, no paresthesias, and numbness. (Tr. 580). However, on March 10, 2015, Dr. Ingram made the following observations:

> **Musculoskeletal**: No pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness.

> **Musculoskeletal**: pain in muscles or joints, limitation of range of motion, no paresthesias or yes numbness on left thigh

(Tr. 578).

On April 10, 2015 (Tr. 576), May 8, 2015 (Tr. 574), June 8, 2015 (Tr. 571), and July 8, 2015 (Tr. 594) [6], Dr. Ingram found that Bass had  back pain; numbness in his left thigh and groin area; and no depressive symptoms.

On January 28, 2016,  Dr.  Ingram completed a Physical Residual Functional Capacity Questionnaire, Exhibit 29F. (Tr. 701-703).  In the questionnaire, Dr. Ingram indicated that Bass needs to frequently alternate between sitting and standing and can frequently lift up to 10 pounds.

---

[6]On July 8, 2015, Dr. Ingram actually just wrote "Musculoskeletal: lumbar back" and did not address the numbness in Bass's thigh or groin area.

(Tr. 701-702). Dr. Ingram also indicated that Bass's pain is severe. (Tr. 702). Dr. Ingram also indicated that Bass would be off task more than 15 minutes per hour, need frequent unscheduled rest breaks throughout the day, and miss work four or more days per month. (Tr. 703). Dr. Ingram explained that these limitations are due to Bass's hernia. (Tr. 701-702). Dr. Ingram also explicitly stated that Bass "is sedentary until abdominal hernia is repaired and physical therapy [and] occupational therapy is complete," but did not state that Bass could not do sedentary work. (Tr. 703).

On February 3, 2016, a cervical spine CT scan without contrast was conducted, which revealed no acute cervical spine abnormalities and no significant canal stenosis or foraminal narrowing. (Tr. 1037). Also on February 3, 2016, an abdomen and pelvis CT scan with contrast was conducted, which revealed a large left lateral ventral hernia ("Spigelian hernia"), most likely related to prior paramedial incision of the abdomen. (Tr. 1040-1041). On February 4, 2016, a lumbar CT scan without contrast was conducted, which showed the following: status post intervertebral disc spacer and anterior fixation at L5-S1 with associated osseous sclerosis and facet arthrosis; and diffuse disc bulge and ligamentum flavum thickening, resulting in mild canal stenosis and severe foraminal narrowing at L5-S1. (Tr. 1039).

On March 22, 2016, myocardial perfusion imaging exams ("MPIs") were conducted, which found no evidence of ischemia or scar, normal left ventricular systolic function, normal gated SPECT left ventricular ejection fraction greater than 54%, and normal left ventricular size. (Tr. 975, 978, 981, 1522). A stress test was also conducted on March 22, 2016, which revealed the following: baseline ECG showed sinus rhythm with non-specific ST changes. (Tr. 968). Bass experienced no chest pain, syncope, or sustained arrhythmias either during or after the exam. (Tr. 968).

On March 31, 2016, Bass visited Dr. Rehan Memon ("Memon"), M.D., F.I.P.P. (Tr. 1298).  In the self-questionnaire, Bass checked off that his pain was aching, deep, squeezing, throbbing, stabbing, and pressur[ized]. (Tr. 1295). Bass also checked off that the pain interfered with his driving, relationships, sleep, work duties, leisure activities, and walking. (Tr. 1295). Bass checked off that he had the following past medical history: high blood pressure, hernia, chronic low back pain, chronic joint (arthritic) pain, and anxiety. (Tr. 1298).

On April 7, 2016, a lumbar spine MRI with and without contrast was conducted, which revealed anterior fusion and an interbody disc spacer at L5-S1; unchanged degenerative changes at L4-L5 and L5-S1, with moderate left foraminal narrowing at L4-L5 and moderate bilateral foraminal narrowing at L5-S1; and no canal stenosis. (Tr. 951, 1056). Vasantha Asokan ("Asokan"), ACNP-BC, found that Bass had no headaches, neck pain, chest pain, shortness of breath, abdominal pain, perianal numbness, or weight loss. (Tr. 952).

On July 28, 2016, Bass was admitted to Ben Taub General Hospital for syncope. (Tr. 925). On July 29, 2016, transthoracic echocardiograms ("TTEs") were conducted at 2:22 p.m. and 2:35 p.m., both of which showed a 60-64 left ventricular ejection fraction with all else being normal. (Tr. 961, 965). Dr. Katarzyna Kimmel ("Kimmel"), M.D., found that Bass also had an unspecified type of chest pain. (Tr. 928). Bass was discharged on July 30, 2016, with the following diagnoses: orthostatic hypotension; acute kidney injury ("AKI") due to prerenal state; cardiac pause of less than one second; history of Wolff-Parkinson-White syndrome status post ablation; chronic pain syndrome; and polypharmacy. (Tr. 925).

On September 27, 2016, an electroencephalogram ("EEG") was normal. (Tr. 1477). On September 28, 2016, a chest x-ray showed no active process in the chest. (Tr. 1093).

On October 6, 2016, Bass was admitted to Ben Taub General Hospital again, after "his wife

13

found him passed out naked on the bathroom floor [with] the garage door . . . open[; Bass] ha[d] no

memory of driving home or anything preceding." (Tr. 917). At time of admittance, Bass had been

taking the following medications: one 50,000-unit capsule of ergocalciferol ("Vitamin $D_2$") weekly;

one 100-mg tablet of quetiapine ("Seroquel") taken daily, which Bass began to take on July 30, 2016,

and ceased taking on October 7, 2016; one 100-mg capsule of gabapentin ("Neurontin") taken three

times daily, which Bass began taking on July 30, 2016, and ceased taking on October 7, 2016; two

60-mg capsules of duloxetine ("Cymbalta") taken daily [7], which Bass ceased to take on October 7,

2016; and one patch of 50 mcg/hr 72 hr fentanyl ("Duragesic") applied every 48 hours [8].

On October 6, 2016, 12 Lead EKGs at 8:47 a.m. and 7:56 p.m., a TTE, a nuclear stress

test, and a two-view chest x-ray were all conducted. (Tr. 921, 957-963, 1663). The 12 Lead

EKGs showed sinus rhythm with frequent supraventricular premature complexes. (Tr. 957-958).

The TTE revealed normal left and right ventricular size and function. (Tr. 921). The nuclear

stress test revealed no evidence of ischemia or scar, normal left ventricular systolic function,

normal gated SPECT left ventricular ejection fraction greater than 54%, and normal left

ventricular size. (Tr. 921). The chest x-ray showed no acute thoracic abnormality. (Tr. 1663).

Throughout Bass's stay at Ben Taub General Hospital, his cardiac regularity,

musculoskeletal symptoms, back, and left lower extremity were assessed: Bass's cardiac

regularity was irregular; he had joint pain, muscle pain, muscle spasms, and muscle stiffness; in

---

[7]The list does not indicate when Bass began taking Cymbalta (Tr. 1600); however, Dr. Vasanthi
C. Janarthanan ("Janarthanan"), M.D., prescribed Cymbalta for Bass on October 15, 2015. Tr.
740.

[8]The list does not indicate when Bass began taking Duragesic. Tr. 1600.

his left lower extremity, Bass experienced numbness, pain, and limited movement; and Bass had limited movement in his back. (*See* Tr. 1774-1793). Also, throughout his stay, patient interventions occurred, revealing that Bass could bear weight as tolerated and that he had range of motion in all his extremities. (Tr. 1810, 1816, 1821-1822, 1827, 1833). Also, Bass was evaluated to see whether clinician collaborations were required for any specialist; no needs were identified for any specialist at any time. (Tr. 1790-1791, 1796-1797, 1840-1841, 1869, 1874-1875).

During his stay at Ben Taub General Hospital, Bass was administered several in-hospital medications: two tablets of potassium chloride ("Klor-Con") (extended release tablet 20 mEq); three tablets of Klor-Con (extended release tablet 60 mEq); four tablets of chewable aspirin; one one-hour transdermal patch of Duragesic (100 mcg/hr); two one-hour transdermal patches of Duragesic (50 mcg/hr) on two different dates[9]; one capsule of Vitamin $D_2$; one 600-mg tablet of ibuprofen ("Motrin") every 12 hours as needed; one 10-mg tablet of baclofen ("Lioresal") nightly as needed; and one 40-mg injection of enoxaparin ("Lovenox") daily. (Tr. 1882-1883, 1920-1921).

On October 7, 2016, Dr. Rashed M. Tabbaa ("Tabbaa"), M.D., who personally examined Bass found that he had atypical chest pain; status post radiofrequency ablation for WolffParkinson-White syndrome; Mobitz II atrioventricular block; and loss of consciousness, cardiogenic etiology. (Tr. 916). Dr. Nasser M. Lakkis ("Lakkis"), M.D., who did not personally examine Bass, agreed that he had an unspecified type of chest pain. (Tr. 920). Bass was subsequently discharged on October 7, 2016. (Tr. 922). At time of discharge, Bass's final diagnoses were syncopal episodes, unclear etiology; bradycardia, possibly secondary to

---

[9]The dates are difficult to comprehend because Exhibit 44F shows that the first patch was started on October 6, 2016, and ended on October 7, 2016. But the second patch was started on October 9, 2016, and ended on October 7, 2016. Tr. 1921.

medications; second degree block, Mobitz Type II on Holter; frequently non-conducted beats on tele; history of Wolff-Parkinson-White status post ablation; and noncardiac chest pain. (Tr. 1612).

On February 26, 2017, Bass was again admitted to Memorial Hermann Hospital in Katy, Texas. (Tr. 1350). At this time, Bass was still taking 60 mg of Cymbalta, 300 mg of quetiapine, 10 mg of amlodipine, 10 mg of baclofen, 50 mcg/hr of fentanyl, 600 mg of gabapentin, and 600 mg of ibuprofen. (Tr. 1343). A chest x-ray showed no acute disease in the chest. (Tr. 1357). A brain CT without contrast showed no abnormalities in the brain or cerebellum. (Tr. 1358). Bass was discharged on February 27, 2017. (Tr. 1350). Upon discharge, Dr. Deepthi Bollineni ("Bollineni"), M.D., made the following diagnoses: atypical chest pain; palpitations; hypokalemia;  hypertension; tachycardia, possibly from opioid withdrawal; clinical dehydration; premature atrial contractions; history of Wolff-Parkinson-White; chronic pain syndrome; opioid dependence with possible withdrawal; opiate tolerance; and obesity. (Tr. 1350).

On April 22, 2017, Bass was once again admitted to Memorial Hermann Hospital in Katy, Texas. (Tr. 1379). A one-view chest x-ray showed no acute intrathoracic abnormalities. (Tr. 1390). A brain CT without contrast showed no acute intracranial hemorrhage or mass effect or evidence  of acute territorial infarction. (Tr. 1392). A CT of the chest, abdomen, and pelvis was unremarkable. (Tr. 1393). At time of discharge on April 22, 2017, Dr. Azmat Syed Khan ("Khan"),  M.D.,  opined that Bass had  chest pain and syncope; hypertension; chronic pain syndrome; and Wolff-Parkinson-White. (Tr. 1379).

On June 29, 2017, Bass was once again admitted  to Memorial Hermann  Hospital in Katy, Texas.  (Tr. 1415). On June 29, 2017, a brain CT without contrast showed that everything was normal, and an endotracheal intubation showed acute metabolic encephalopathy,

hypokalemia, and possible Seroquel overdose. (Tr. 1431-1432). A chest x-ray showed the following: ET tube was at the carina, but should have been withdrawn a few centimeters; the nasogastric tube was present, extending into the stomach, but the tip was not seen; and there was no acute cardiopulmonary disease. (Tr. 1448). On June 29, 2017, Dr. Qi-Ming Zhu ("Zhu"), D.O., made the following assessments: metabolic encephalopathy secondary to Seroquel overdose; chronic pain syndrome; acute respiratory failure secondary to Seroquel overdose (Tr. 1405), which were partially confirmed by Dr. Gopikishan Rao Rangaraj, M.D., ("Rangaraj") [10]. (Tr. 1438). A correspondence between Dr. Khan, Dr. Zhu, Dr. Rangaraj, Dr. Morayinko Akintola ("Akintola"), M.D., Dr. Paul E. Bing ("Bing"), M.D., from June 30, 2017, revealed the following:

> **Problems**
>> **Active**
>>> Neuropathy
>>> Chronic pain syndrome
>>> WPW—White-Parkinson-White
>>> syndrome Hypertension
>> **Resolved**

---

[10] Dr. Rangaraj made the following assessments: encephalopathy, secondary to toxic and metabolic causes; respiratory failure requiring intubation and mechanical ventilation; no evidence of sepsis; history of Wolff-Parkinson-White syndrome; history of back surgery; chronic pain; and opioid dependence. (Tr. 1438).

>>> Depression
>>> Hernia of abdominal cavity
>> **Diagnoses This Visit**
>>> Metabolic encephalopathy . .
>>> . Hypokalemia . . .
>>>> Respiratory failure, unspecified, unspecified whether with hypoxia or
>>> hypercapnia

(Tr. 1407). Bass was subsequently discharged on July 1, 2017. (Tr. 1415).

On September 8, 2017, Dr. Trinh completed a Physical Residual Functional Capacity

Questionnaire, Exhibit 41F. (Tr. 1530-1532). In the questionnaire, Dr. Trinh indicated that Bass

would need to alternate between sitting and standing at will and could not lift any weight. (Tr.

1530-1531). Dr. Trinh also found that Bass's degree of pain was severe. (Tr. 1531). Dr. Trinh

also indicated that Bass would be off task due to his pain for over 15 minutes per hour, would

need frequent unscheduled breaks throughout the day, and would miss work due to pain four or

more days per month. (Tr. 1531). Dr. Trinh explained that the limitations were due to

radiculopathy, drop foot, neuropathy, pinched sciatic hernia[11], and spinal stenosis. (Tr. 1530).

### 2. Mental Health Impairments

On September 4, 2015, Bass was hospitalized at UT Health Harris County Psychiatric Center

for his mental health. (Tr. 625). At the time of Bass's admittance, Dr. Benjamin Yee ("Yee"), M.D.,

made the following observations in Bass's Mental Status Exam ("MSE"):

> **General appearance**: clean/neat, made good eye contact, easily engaged, normal
> psychomotor activity.
> **Musculosketal System**: Normal gait/station, with no abnormal movements.
> **Speech**: normal in rate, volume, prosody and
> tone **Thought Process**: circumstantial
> **Thought Content**: positive for suicidal ideations, negative for any homicidal
> ideations
> **Perception**: negative for any
> hallucinations **Mood**: depressed

---

[11] Because of the hernia, Dr. Trinh opined that Bass would not be able to lift any weight. (Tr.
1531).

> **Affect**:
> depressed/dysphoric
> **Insight**: fair
> **Judgment**: fair
> **Orientation**: person, place
> **Attention/Concentration**:
> good **Knowledge**: appropriate
> **Abstractions**: intact **Memory**:
> good

**Estimated Intelligence**: average

(Tr. 627-628). Dr. Yee observed that Bass was dysphoric and suicidal and diagnosed him with

unspecified, recurrent major depressive disorder. (Tr. 629).

On September 7, 2015, Bass was still reporting suicidal ideation. (Tr. 642). He requested to

be discharged on September 8, 2015. (Tr. 642). Using the Brief Psychiatric Rating Scale ("BPRS"),

Dr. Omar Pinjari observed the following about Bass:

**Somatic—Degree of concern over present bodily health.**
   1—Not Reported

**Anxiety—Worry, fear, or overconcern for present or future.**
   1—Not Observed

**Conceptual Disorganization—Degree of speech incomprehensibility.**
   1—Not Observed

**Guilt Feelings—Overconcern or remorse for past behavior.**
   1—Not Reported

**Tension—Rate motor restlessness (agitation) observed during the interview.**
   1—Not Observed

**Grandiosity—Inflated or self-esteem (self-confidence), or inflated appraisal of one's talents, powers, abilities, accomplishments, knowledge, importance or identity.**
   1—Not Reported

**Depression Mood—Subjective report of feeling depressed, blue, "down in the dumps," etc.**
   1—Not Reported

**Hostility—Animosity, contempt, belligerence, disdain for other people outside the interview situation.**

   1—Not Reported

**Suspiciousness—Belief (delusional or otherwise) that others have now, or have had in the past, malicious or discriminatory intent toward the patient.**
   1—Not Reported

**Motor Retardation—Reduction in energy level evidenced in slowed movements.**

19

1—Not Reported

**Uncooperativeness—Evidence of resistance, unfriendliness, resentment, and lack of readiness to cooperate with the interviewer.**
1—Not Reported

**Unusual Thought Content—Severity of delusions of any type—consider conviction, and effect on actions.**
1—Not Reported

**Blunted Affect—Diminished affective responsivity, as characterized by deficits in facial expression, body gesture, and voice pattern.**
1—Not Reported

**Excitement—Heightened emotional tone, including irritability and expansiveness (hypomaniac affect).**
1—Not Reported

**Disorientation—Confusion or lack of proper association for person, place or time.**
1—Not Reported

**Global Rating—Indicate the extent of positive or negative change, if any, observed since admission to your treatment unit.**
1—Markedly Improved

(Tr. 643-645). Bass was discharged on September 8, 2015, after Licensed Professional Counselor ("LPC") Tiffany Bynum signed off on his release, finding that Bass had everything under control, including a plan in case he relapsed and a plan to see his doctor regularly. (Tr. 631-635). On September 17, 2015, Dr. Rich Wiley ("Wiley"), M.A., found that Bass was "unable to work" but stated no reasons as to why Bass was unable to work. (Tr. 648).

Bass was assessed several times by Dr. Janarthanan. Although she did not personally examine Bass, at his first examination on September 17, 2015, Dr. Janarthanan made the following assessments regarding Bass's mental health: attitude—cooperative; motor activity—normal; speech—normal rate and rhythm; language—spontaneous; mood—irritable, anxious, depressed; affect—appropriate; thought process—logical; associations—goal-directed;

20

hallucinations,  delusions, suicidal ideations, homicidal ideations—absent; sensorium—alert;
cognition—grossly intact; orientation—person, place, time, situation; immediate recall, recent,
and remote memory— intact; attention span and concentration—good; fund of
knowledge—appropriate for age  and education level; and insight, judgment—limited. (Tr.
782-783). On May 23, 2016, Dr. Janarthanan's assessments of Bass were the same as on
September 17, 2015, except that she did not observe his immediate recall, attention span and
concentration, or his intellectual functioning, and noted that Bass's mood was euthymic and his
affect was blunt. (Tr. 816-817). On June 13, 2017, the most recent assessment by Dr.
Janarthanan, her assessments were the same as on May 23, 2016, except that his mood was
dysthymic and his affect was constricted and blunt. (Tr. 15641565).

For his mental health impairments, Dr. Janarthanan also prescribed the following
medications for Bass: 60 mg tablets of Cymbalta and 200 mg tablets of Seroquel on October 15,
2015; and 300 mg tablets of Seroquel and 100 mg  tablets of sertraline ("Zoloft") on  December
7,  2015. (Tr. 732, 740).


Here, substantial evidence supports the ALJ's findings that Bass's disorders of
hypertension, history of Wolff-Parkinson-White syndrome status post ablation, chronic pain
syndrome, history of back surgery, lumbar spondylosis, history of hernia repair, depression, and
anxiety were severe impairments at step two, and that such impairments at step three,
individually or in combination, did not meet or equal a listed  impairment. This factor weighs in
favor of the ALJ's decision.

**B. Diagnosis and Expert Opinion**

The second element considered is the diagnosis and expert opinions of treating  and

examining physicians on subsidiary questions of fact. The Social Security regulations require the Commissioner to evaluate every medical opinion it receives, regardless of its source. 20 C.F.R. § 404.1527(c) (2019). The regulations provide in pertinent part that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *Id.* § 404.1527(a)(1). The ALJ has the ultimate responsibility to determine disability status. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). When good cause is shown, less weight, little weight, or even no weight may be given to a treating physician's opinion. *Id.* The Fifth Circuit  in *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) held that when a treating physician's opinion about the nature and severity of a claimant's impairment is well-supported and consistent with other substantial evidence, an ALJ must afford it controlling weight. The Fifth Circuit further instructed that an ALJ has good cause to discount an opinion on a treating physician where "the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456. In such a situation, the ALJ must assess what weight the opinion should be given based on factors enumerated in 20 C.F.R. § 404.1527(c). Those factors include: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; (6) the specialization of the treating physician; and,  (7) any other considerations. *Id.* These factors need not be considered when there is "competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or

when "the ALJ weighs treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. Simply put: "[t]he Newton court limited its holding to cases where the ALJ rejects the sole relevant medical opinion before it." *Qualls v. Astrue*, 339 F. App'x 461, 467 (5th Cir. 2009).

As discussed above, the treating physician rule provides that the opinion of a claimant's treating physician is entitled to great weight. *See Newton,* 209 F.3d at 455. A consultative physician may personally examine the claimant but has no treating relationship. *See* 20 C.F.R. § 404.1526(d) (2019). The deference provided to treating physicians' opinions does not extend to consultative examining physicians. 20 C.F.R. § 404.1527(c). "[W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994). As for the opinions of State Agency Medical Consultants, the regulations provide, in pertinent part:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled . . . .

20 C.F.R. § 404.1527(e)(2)(i), 416.927(e)(2)(i) (effective August 24, 2012-March 26, 2017).

*Ventura v. Colvin*, No. 6:-CV-16, 2017, WL 1397130, at *12 (S.D. Tex. Feb. 27, 2017), *adopted*, 2017 WL 1397131 (S.D. Tex. Mar. 30, 2017). "In evaluating the opinion of a non-treating physician, the ALJ is free to incorporate only those limitations that he finds 'consistent with the

23

weight of the evidence as a whole.'" *Thompson v. Colvin*, No. 4:16-CV-00553, 2017 WL

1278673, at \*12 (S.D. Tex. Feb. 14, 2017) (citing *Andrews v. Astrue*, 917 F. Supp. 2d 624, 642

(N.D. Tex. 2013). "The ALJ cannot reject a medical opinion without an explanation." *Loza v.

Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Kneeland v. Berryhill,* 850 F.3d 749, 761 (5th Cir. 2017)

(finding that the ALJ committed error in failing to address examining physician's conflicting

opinion thereby making it impossible to know whether the ALJ properly considered and weighed

the opinion). *But see Hammond v. Barnhart*, 124 Fed. Appx. 847, 851 (5th Cir. 2005) (finding

that the failure by the ALJ to mention a piece of evidence does not necessarily mean that the ALJ

failed to consider it). Thus, the absence of an express statement in the ALJ's written decision

does not necessarily amount to reversible error because procedural perfection in administrative

proceedings is not required. *See, e.g., Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); *Jones

v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) ("The party seeking to overturn the

Commissioner's decision has the burden to show that prejudice resulted from an error.").

 RFC is what an individual can still do despite his limitations. It reflects the individual's

maximum remaining ability to do sustained work activity in an ordinary work setting on a regular

and continuing basis. SSR 96-8p, 1996 WL 374184, at \*2 (SSA July 2, 1996). The RFC

determination is "the sole responsibility of the ALJ." *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir.

2012). The ALJ is not required to incorporate limitations in the RFC that he did not find to be

supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

 Bass argues that the ALJ failed to give proper consideration to the medical opinions of

the treating physicians, Dr. Ingram and Dr. Trinh, in formulating his RFC. Bass argues that

absent first-hand evidence or a showing of good cause, the ALJ may only disregard a treating

source opinion after weighing the opinion according to the factors set forth at 20 C.F.R. §

404.1527(c). Bass also argues that the ALJ failed to provide a detailed analysis as to why he considered the opinions of Dr. Ingram and Dr. Trinh "unsupported" when he granted great weight to the opinion of Dr. Oguejiofor, a non-examining physician, and no weight to the opinions of Dr. Ingram and  Dr. Trinh. Bass argues that Dr.  Ingram's opinion indicates that he would need frequent,  unscheduled rest breaks and would miss four or more days of work per month. Bass also argues that both opinions indicate that he would be off task due to his pain and other symptoms over fifteen minutes per hour. Bass argues that the ALJ erred by not considering these limitations when it found that he could do sedentary work.

The Commissioner counters that substantial evidence supports the ALJ's determination that both opinions were entitled to no weight. The Commissioner argues that the ALJ gave explicit reasons for its decision, including the lack of deficits in the neurological examination. The Commissioner argues that there was good cause to find that the opinions were entitled to no weight because they were checkbox forms, and were therefore, conclusory. The Commissioner argues that, thus, the ALJ's RFC assessment is supported by substantial evidence.

Both Dr. Ingram and Dr. Trinh are treating physicians. So, the ALJ was obligated to give the treating physicians' opinions controlling  weight, unless the evidence is conclusory, unsupported by medically acceptable techniques, or otherwise unsupported by the evidence. The ALJ considered both opinions and gave each "no weight." The law is clear that "[t]he ALJ cannot reject a medical opinion  without an explanation." *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017). Here, the ALJ did just that. The ALJ set forth an explanation as to why he assigned no weight to the either opinion. The ALJ wrote, in pertinent part:

> The undersigned gives great weight to the opinion of the medical expert because
> he has reviewed the entire record, is board certified in a specialty that is related to
> the  claimant's impairments, is familiar with the listings of the Commissioner, and
> is familiar in evaluating disability claims under the Social Security Act  and its

regulations. The medical expert's opinion is also consistent with the medical evidence of the record, including the treatment notes and imaging reports, and the claimant's activities of daily living.

In view of Dr. Oguejiofor's opinion, the undersigned gives no weight to the opinions in Exhibits 23F, 29F, 41F as unsupported by the medical evidence including the lack of deficits in the neurological examination.

The State agency medical consultants also assessed a limited sedentary residual functional capacity, the undersigned gives great weight (Exhibits 1A, 3A). . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent.

In terms of the claimant's alleged back and leg pain, although the claimant has a history of back surgery, Dr. Oguejiofor testified that is no evidence of any neurological deficits, and that the latest MRI of the lumbar spine from the April 2016 showed no evidence of central spinal canal stenosis.

In terms of the claimant's alleged chest pain and dizziness, Dr. Oguejiofor testified that the claimant has a history of Wolff-Parkinson-White syndrome, which is characterized by an abnormal electrical pathway in the heart that can lead to an irregular heartbeat or arrhythmia, for which he had an ablation, which is a disruption of the normal pathway, in 2007, and that the record does not support the presence of congestive heart failure or any other sequelae. He stated that the claimant also has episodes of recurring syncope and blackouts with no obvious diagnosis, but there were concerns that the claimant's multiple medications including opiates and anti-depressants may have contributed. Dr. Oguejiofor assessed limitations in the residual functional capacity due to the side effects of these medications.

In terms of the claimant's alleged hernia, Dr. Oguejiofor advised against heavy lifting, but explained that there are no symptoms otherwise. He considered the hernia when assessing the sedentary residual functional capacity.

In terms of the claimant's alleged depression and anxiety, the mental status examinations show some mood variable mood, but alert sensorium, grossly intact cognition, intact immediate, recent, and remote memory, and good attention span and concentration. This is consistent with the ability to do simple work as

determined.

As for the other opinion evidence, the State agency consultants found no mental impairment. In view of the medical evidence submitted at the hearing level, the undersigned gives no weight to this determination. (Tr. 22-24).

Upon this record, the ALJ properly incorporated all the appropriate functional limitations in his RFC to account for Bass's hypertension, history of Wolff-Parkinson-White syndrome status post ablation, chronic pain syndrome, history of back surgery, lumbar spondylosis, history of hernia repair, depression, and anxiety. The ALJ thoroughly discussed  the objective medical evidence; the testimony and Function Reports; and the opinion evidence. While the ALJ did not explicitly state that there was good cause to give "no weight" to the opinions of Dr.  Ingram and Dr. Trinh, this is harmless error. The opinions of Dr.  Ingram and Dr. Trinh, are check-box forms, which are considered conclusory for good cause purposes and are entitled to no weight. *See Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011) ("[T]he questionnaire format typifies 'brief or conclusory' testimony . . . [T]he Agency relied on other physicians—both examining and treating  physicians—to draw conclusions about Mr. Foster's residual functional capacity."); *see also Gannon v. Astrue*, No. 3:07-CV-1057-N, 2008 WL 4490738, at *14 (N.D. Tex. Oct 3, 2008) (finding that the ALJ had good cause to assign no weight to the treating physician's opinion, where the statements were in check-box form, and so, were brief and conclusory, and where the medical expert testified that the treating physician's opinion was unsupported by the evidence). Moreover, the opinions on the forms are not supported by their contemporaneous treating records. Neither Dr.  Ingram's nor Dr. Trinh's opinions explicitly  state that Bass is unable to do even sedentary work.  Furthermore,  Dr.  Ingram's opinion states that Bass is "sedentary until abdominal hernia is repaired [and] physical therapy/occupational therapy is complete." (Tr. 703). The ALJ's RFC determination is consistent with the record as a whole, and

is supported by substantial evidence. The ALJ, based on the totality of the evidence, concluded that Bass could perform sedentary work with limitations, and gave specific reasons in support of this determination.

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ gave Dr. Ingram's and Dr. Trinh's opinions no weight because their opinions were unsupported by the medical evidence, including the lack of deficits in the neurological examination. Any lack of thoroughness, or explicit reasoning thereof, is harmless. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able

to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Here, Bass testified about his health and its impact on his daily activities. Bass stated that immediately after the surgery in 2013, he "was in immense pain and noticed right away that [he] had problems in [his] left leg." (Tr. 43). He stated that at that time, he did not know he had a hernia.  (Tr. 43). He stated that after the surgery, there was a different pain, "a bone throb and  a stabbing/burning pain," that did not exist before the surgery. (Tr. 43). Bass testified that he has two different types of pain, a bee sting-like pain in his top thigh and a needle sting-like pain at the bottom of his feet, which causes him to pull out his toenails and prevents him from wearing socks. (Tr. 44). Bass testified that the pain medications brings his pain level down from an eight to a five or six. (Tr. 45). Bass stated that the hernia prevents him from doing the dishes or grooming himself, and that he has not gotten surgery yet because he has not had insurance until recently. (Tr. 45-46).  Bass testified that he can only sleep for an hour or two at a time because of the back pain. (Tr. 47).  Bass testified that he must use a seat in the shower and cannot wear any restrictive clothing  throughout the leg or foot. (Tr. 47). Bass testified that he is in the recliner or medical bed around four to five hours a day and has trouble lifting things. (Tr. 48). Bass testified that he is unable to take care of his family, be intimate with his wife anymore, or play with the kids. (Tr. 48-49). Bass testified that the medications do not really help. (Tr. 49). Bass also testified that he has focus issues and gets angry  with his wife and kids, causing him to go to a room and be by himself with the lights off, which has gotten worse over time. (Tr. 49). Bass testified that although he has not driven in six or seven months,  he is physically able to  drive.

(Tr. 50). Bass testified that he can do no chores at the house, wash the dishes, or prepare meals.

(Tr. 50-51).  Finally, Bass testified that while he is only able to attend the games for a short while

and is unable to sit for long time periods, he is still able to attend his sons' football games. (Tr.

51).

Bass completed a Function Report on June 6, 2015. (Tr. 284-294). Bass described a

typical day as waking up at around 2-4 a.m. and then reading or watching television until he falls

asleep again, after which he wakes up around 7-8 a.m. and spends the majority of the day

watching television in his pajamas. (Tr. 288). Bass stated that he is no longer able to do house

work, yard work, be intimate, or play with his kids. (Tr. 288). Bass indicated that it causes him

pain to take care of himself, but did not indicate that he needs help dressing, bathing, shaving,

feeding himself,  or using the toilet. (Tr. 288). Bass stated that he prepares meals for himself

daily, can  clean the countertops, and is able to do load the washer and fold clothes, but cannot

take the clothes out of the dryer or do the dishes. (Tr. 289-290). Bass indicated that he can, and

does, drive and can shop for groceries and clothes about 2-3 times per month for an hour each

time. (Tr. 290). Bass indicated  that while he can take care of the finances, his wife generally

takes care of them because "[t]he  medications cloud [his] concentration." (Tr. 290-291). Bass

described his hobbies as hunting,  fishing, kayaking, cooking or grilling out with friends and

family, reading, and watching television; he can no longer hunt, fish, or cook out. (Tr. 291). Bass

indicated that he daily talks on  the phone, emails people, and talks with his parents; he talks with

his friends when they visit. (Tr.  291). When he goes to  Walmart or to his appointments, he does

not need help. (Tr. 291). Bass indicated that he gets angry sometimes and is easily frustrated and

agitated and cannot tolerate  others well; he also stated that he no longer visits his friends. (Tr.

292).  Bass indicated that he raises his voice often when "people want to boss [him] around," and

he is unable to handle stress or changes to routine well. (Tr. 293). Bass indicated that he cannot lift more than 10 pounds, is unable to walk for more than 200-300 feet without needing rest, is unable to pay attention for more than 45 minutes at a time, is unable to finish his activities, and can follow instructions "fairly well." (Tr. 292). Bass also indicated that he uses a cane to navigate the stairs and to walk on uneven surfaces and wears a girdle to hold in his stomach. (Tr. 293).

Bass completed a second Function Report on September 24, 2015. (Tr. 320-328). There have only been minor changes to his abilities since June 6, 2015: Bass wakes up for the first time from 1-3 a.m. every night. (Tr. 322). He picks up his 7-year-old son from school. (Tr. 322). He weekly talks on the phone and sits and talks with people. (Tr. 325). Bass no longer visits with his family. (Tr. 326). He estimated that he can lift no more than 5 pounds. (Tr. 326).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ tied his findings to Bass's reported activities of daily living as set forth in the Function Reports, in the medical record, and testified to at the hearing. The ALJ went through Dr. Oguejiofor's testimony, taking into account both his diagnoses and recommendations. The ALJ also summarized Bass's hospitalization for his mental health impairments. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age
The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Nicole Fuscaldo, a vocational expert ("VE"), at

the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.

*Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must  give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Id.* at 436.

The ALJ posed comprehensive hypothetical questions to the VE (Tr. 59-62), and Bass's attorney representative questioned the VE (Tr. 62-63). The record shows the following hypothetical questions were posed at the hearing by the ALJ:

Q.      Okay, and assume a hypothetical individual the claimant's age and educational background  with the ability to perform the exertional demands of sedentary work  as defined in the Commissioner's regulations, specifically the individual can occasionally lift and/or carry 10 pounds; frequently lift and/or carry 5 pounds; stand and walk for about 2 hours out of an 8-hour workday with normal breaks; sit for about 6 hours out of an 8-hour workday with normal breaks. The individual requires a sit/stand option where the individual has to stand every two  hours and then return to the seated position after five minutes of standing. The individual can occasionally climb ramps and stairs. The individual must avoid climbing ladders, ropes or scaffolds. The individual can occasionally  balance, occasionally stoop, occasionally kneel, occasionally crouch and occasionally crawl.  Further assume that the individual is to avoid working around unprotected heights,  open flames and dangerous and/or moving machinery. The individual is to avoid  concentrated exposure to extreme heat, cold and humidity. The individual is to avoid rough and uneven surfaces. The individual can understand, remember and carry out short and simple instructions, maintain attention and

concentration for extended periods on simple tasks. The individual is limited to simple, routine and repetitive tasks. The individual is limited to simple, routine and repetitive tasks. The individual is limited to superficial interaction with the general public, occasional interaction with co-workers and occasional interaction with supervisors. Would that individual be able to perform any of the claimant's past work?

A.     They would not be, judge.

Q.     And would there be any other jobs this individual could perform?

A.     They could perform work as a surveillance monitor under that hypothetical. That's a sedentary/unskilled position with an SVP of 2, DOT code 379.367-010. There are around 140,000 of those positions nationally. They could also perform work as an optical goods worker, also sedentary, unskilled with an SVP of 2, DOT code 713.684-038 and there are around 175,000 of those positions nationally. And also as a final assembler, judge, also sedentary, unskilled with an SVP of 2, DOT code 713.687-018 of which there are around 140,000 and it just so happens that that and the surveillance monitor have the same number.

Q.     Okay, and are there any conflicts between your testimony and the information found in the Dictionary of Occupational Titles or any of its companion publications?

A.     The ability to do that sit/stand option for two hours every five minutes is my opinion and that's not in the DOT.

Q.     And let me pose a second hypothetical, the same as the first, however the individual can sit for only 30 minutes at a time without needing to change position and stand for 15 minutes at a time without change—needing to change positions. Would that individual still be able to perform these jobs?

A.     I think they would be, judge. I think that would fall into the sedentary RFC still because that would be sitting three—one, two, three, four—yeah, they'd still be sitting for around six hours of their day under that hypothetical and standing with—for two.

Q.     Okay. Let me pose a third hypothetical, the same as the first, however add the additional limitation that the individual would need 2 to 3 unscheduled work breaks for 30 minutes in duration. Would that individual be able to perform these jobs?

A.     They would not be, judge.

Q.     And would there be any other jobs this individual could perform?

A.     There would not be. (Tr. 59-62).

In addition, Bass's attorney posed several questions to the VE regarding absences and being off task:

> Q.     What would typically be the maximum amount of allowable absences in unskilled/sedentary work?
>
> A.     Generally,  I would say you could miss no more than one to two  workdays each work month.
>
> Q.     Okay. And if the sit/stand option were a sit/stand at will, would that affect any of the sedentary/unskilled jobs that you had offered?
>
> A.     It would.  It's really hard to give an at-will in sedentary work because, oftentimes, you would not be within like the confines of sedentary work,  so you might be up more than two hours that they're giving you—
>
> Q.     Right.
>
> A.     –in that being seated for that six-hour time period.
>
> Q.     So that would knock the base out considerably?
>
> A.     Yes.
>
> Q.     Okay, thank you. And  in terms of time off task, what would be the maximum that  would  typically  be  allowed  while  being  able  to  maintain  that unskilled/sedentary?
>
> A.     Oh, around 20 percent of—you can be off task around 20 percent of your day is the max of time off task. (Tr. 62-63).

A hypothetical question  is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. As discussed above the, the ALJ's RFC assessment is supported by substantial evidence, and was incorporated in the hypothetical question posed to the VE. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Bass was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Bass could perform work as a surveillance monitor, an optical goods worker,  and a final

34

assembler. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Bass was not disabled within the meaning of the Act, and therefore, was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

**VI.**     **Conclusion**

Considering the record as a whole, the Court is of the opinion that the ALJ and the

Commissioner properly used the guidelines propounded by the Social Security Administration,

which directs a finding that Bass was not disabled within the meaning of the Act, that substantial

evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.

As such, it is ORDERED Plaintiff's Motion for Summary Judgment (Document No. 9) is

DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and

the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 19th day of June, 2020.

Frances H. Stacy
United States Magistrate Judge